24CA1084 Peo in Interest of CCN 07-09-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1084
Arapahoe County District Court No. 22JD263
Honorable Bonnie McLean, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of C.C.N.,

Juvenile-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE BROWN
Freyre and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 9, 2026

Philip J. Weiser, Attorney General, Katherine Wynn, Assistant Attorney General Fellow, Denver, Colorado, for Petitioner-Appellee

Springer and Steinberg, P.C., Harvey A. Steinberg, Taylor Ivy, Denver, Colorado, for Juvenile-Appellant

¶ 1     C.C.N., a juvenile, appeals his adjudication of delinquency for one count of sexual assault on a child (pattern of abuse) and one count of sexual assault on a child.  We affirm.

## I.     Background

¶ 2     In 2018, after then-thirteen-year-old M.L. was admitted to a mental health facility, she told her mother and her older sister, T.L., that her cousin, C.C.N., had sexually assaulted her multiple times.  T.L. then disclosed that C.C.N. had sexually assaulted her once.  After Sergeant Robert Fowler conducted an initial interview of M.L., the victims' mother had the investigation closed.

¶ 3     In 2022, a friend helped M.L. reopen the investigation.  Detective Jake Swartz from the Aurora Police Department's Crimes Against Children Unit was assigned as the investigating detective, and he arranged for M.L. to participate in a forensic interview.  Detective Swartz also interviewed T.L.  Based on the victims' disclosures, the prosecution charged C.C.N. with one count of sexual assault on a child as a pattern of abuse relating to M.L. and one count of sexual assault on a child relating to T.L.

¶ 4     The juvenile court held a one-day bench trial.  M.L. testified that C.C.N. had sexually assaulted her multiple times when she

was between four and nine years old.  T.L. testified that C.C.N. had sexually assaulted her once when she was six or seven years old.  C.C.N. testified that he never touched M.L. or T.L. inappropriately and never had them touch him inappropriately.  The juvenile court adjudicated C.C.N. delinquent as charged and sentenced him to two years of probation.[1]

## II.    Evidentiary Challenges

¶ 5    C.C.N. contends that the juvenile court erred by (1) admitting M.L.'s hearsay statements and (2) excluding evidence that M.L. had falsely accused her father of sexually assaulting her.  We are not persuaded.

## A.    Standard of Review

¶ 6    "A trial court has substantial discretion in deciding questions concerning the admissibility of evidence." *People v. Eppens*, 979 P.2d 14, 22 (Colo. 1999).  We review a trial court's evidentiary rulings for an abuse of discretion.  *Zapata v. People*, 2018 CO 82, ¶ 25.  A court abuses its discretion when its ruling is manifestly

---

[1] On appeal, C.C.N. challenges only the evidence related to M.L. but asks us to reverse his adjudications on both counts.  Based on our disposition of the issues related to M.L., we necessarily affirm the adjudication as to T.L.

2

arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16, *aff'd,* 2023 CO 22. If the court erred, we consider whether the error was harmless, reversing only "if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Hagos v. People*, 2012 CO 63, ¶ 12 (citation omitted).

## B. Hearsay

¶ 7    C.C.N. contends that the juvenile court erred by admitting as prior consistent statements (1) M.L.'s entire forensic interview and (2) statements M.L. made to Sergeant Fowler. We perceive no reversible error.

### 1. Applicable Law

¶ 8    Hearsay is any "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). CRE 802 prohibits the admission of hearsay unless an exception applies.

¶ 9    In Colorado, a witness' prior consistent statement may be admitted in two ways. *Eppens*, 979 P.2d at 20. Such statements may be admitted as substantive nonhearsay evidence under CRE 801(d)(1)(B) to rebut an express or implied charge of recent

fabrication or improper influence or motive. *See id.* Or such statements may be admitted under the common law, outside of CRE 801(d)(1)(B), to rehabilitate a witness whose credibility has been attacked. *Id.* at 20-21.

¶ 10     Because statements admitted under the common law cannot be offered for their truth and are "only admissible for the nonhearsay purpose of repairing a witness' credibility," they need not comply with the requirements of CRE 801(d)(1)(B). *Id.* at 20. Such statements are instead "governed by the general principles of relevancy found in CRE 401, 402, and 403." *Id.* at 21-22. To be relevant, the evidence must "have some probative force bearing on the credibility of the witness beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with [their] trial testimony." *Id.* at 22.

¶ 11     "Determining 'how much of a prior consistent statement is admissible is based upon its relevance and probative use,'" which "turns on the scope of impeachment and the attack on the witness's credibility." *People v. Miranda*, 2014 COA 102, ¶ 15 (citations omitted), *abrogated on other grounds by, Rojas v. People*, 2022 CO 8, ¶¶ 41, 44. "If the impeachment goes only to specific facts, then

4

only prior consistent statements regarding those specific facts are relevant and admissible." *People v. Clark*, 2015 COA 44, ¶ 126 (citation omitted). But if the impeachment is "general and not limited to specific facts, then the [fact finder] should have access to all the relevant facts, including consistent and inconsistent statements." *Id.* (citation omitted).

### 2.    The Forensic Interview

¶ 12    C.C.N. contends that the juvenile court erred by admitting M.L.'s forensic interview because it was hearsay and was not otherwise admissible under CRE 801(d)(1)(B) or the common law as set forth in *Eppens*. On appeal, the People concede that M.L.'s statements in the forensic interview constituted hearsay and that CRE 801(d)(1)(B) does not apply. But they argue that the forensic interview was admissible under *Eppens* to rehabilitate M.L.'s credibility. We conclude that the court did not err by admitting the forensic interview under *Eppens*.

### a.    Additional Background

¶ 13    At trial, M.L. testified that every time she saw C.C.N. when she was between the ages of four and nine, he sexually assaulted her. M.L. testified about five specific incidents:

5

- The first incident occurred in the basement of M.L.'s house. She said C.C.N. "said if I didn't lick his penis that he wouldn't play with me," so she licked his penis while they were sitting in a "princess ball pit." She said the ball pit was pretty big, but she was also four years old and really small.

- The second incident involved M.L. and C.C.N. playing hide-and-seek with another cousin when M.L. was four or five years old. M.L. said that, while they were under the basement stairs, C.C.N. made her touch his penis with her hand.

- The third incident happened when M.L. and C.C.N. were watching television in the basement. She said C.C.N. made her take off all her clothes, but she was not sure if C.C.N. took off his clothes.

- The fourth incident occurred when C.C.N. had two friends show their penises to M.L. at a backyard gathering at an aunt's house.

- The fifth incident involved C.C.N. trying to put his penis inside M.L.'s vagina, which she said "burned."

¶ 14    During cross-examination, defense counsel asked M.L. whether "these allegations [came] out after [she was] admitted to a mental health facility," and M.L. responded, "Yes." Counsel asked whether M.L. had told the hospital that she previously disclosed the abuse, and M.L. said, "Yes." M.L. explained that she had previously told her mother that C.C.N. "showed [her] his privates" when she was five or six.

¶ 15    Then counsel asked how many times M.L. had seen C.C.N.'s penis and asked her to describe it. M.L. said, "It's a penis," and agreed with counsel's characterization that it was "fairly normal." Counsel continued to ask M.L. what the size of C.C.N.'s penis was, if it was "the shape of a mushroom," and what the "tip of his penis" looked like. M.L. could only say that it was a normal penis. Counsel then asked, "[S]o what I'm trying to understand is, you can't actually describe the tip of his penis; is that accurate?" M.L. responded, "Sure. Yes."

¶ 16    Counsel also asked whether M.L. had previously told a social worker that, during the third incident, C.C.N. had taken off his

clothes as well.[2]  M.L. said, "Maybe.  I don't remember exactly what happened or what I told her."  Counsel later asked M.L. if it was true that she had been able to describe C.C.N.'s body in the forensic interview.  M.L. responded, "I don't think so."  Counsel asked if M.L. told the social worker that C.C.N.'s body was different than it is now, and M.L. said she did not "remember saying anything like that."

¶ 17     Counsel then played a portion of the forensic interview for M.L. and asked, "Did you hear yourself describing [C.C.N.'s] body?"  M.L. agreed that she heard herself say that C.C.N. was white and that he was skinnier before and that she heard herself describe his hair.  Counsel asked, "So, to be clear, you can describe [C.C.N.'s] body but you don't have the ability to describe his penis; is that correct?"  M.L. said, "[Y]es, I cannot describe his penis," but explained that there were pictures showing that C.C.N. is skinny, white, and balding, but there were no pictures of his penis.

¶ 18     Counsel also asked M.L. if it was true that she told Sergeant Fowler that C.C.N. had "never put anything in [her] body?"  M.L.

_____

[2] Although the record is not entirely clear, it appears defense counsel was referencing the 2022 forensic interview.

responded "No," but explained, "I did not tell [Sergeant Fowler] everything because that was the first time it was coming out, and I was scared." She also said, "I remember answering no to most of [Sergeant Fowler's] questions so I didn't have to talk to him anymore." In response to counsel's questions, M.L. admitted her "statement did change" between 2018 and the 2022 forensic interview but said that the forensic interview was "what [she's] sticking with today."

¶ 19 During the direct examination of Detective Swartz, the prosecutor moved to admit M.L.'s entire forensic interview. Defense counsel objected, arguing that the exhibit was hearsay. The prosecutor argued that the evidence was admissible under CRE 801(d)(1)(B), as a prior consistent statement under *Eppens*, or under the "rule of completeness" because defense counsel played a part of the interview during M.L.'s cross-examination. Defense counsel responded that the interview contained statements that were not referenced during cross-examination and "an entirely new allegation." The juvenile court admitted the entire forensic interview without specifying the basis for its ruling.

¶ 20    T.L. testified that C.C.N. sexually assaulted her once when she was six or seven years old.  T.L. said that someone came into her bedroom and tried to touch her vagina over her clothes.  T.L. did not see the individual, but she knew it was C.C.N. by his breathing and his long and clammy fingers, and because the light from the door showed his tall frame.

¶ 21    C.C.N. testified that he has a genetic disorder that causes him to be taller than average and have a small penis.  He also said he was uncircumcised.  He then described the ball pit at M.L.'s house as an enclosed space, roughly four feet wide by four feet long with a portal door to get inside.  C.C.N. said that at the time of the alleged ball pit incident with M.L., he was six foot seven inches tall.  C.C.N. also said that the ball pit was on the main floor and that he was not allowed in the basement.

¶ 22    C.C.N.'s father testified that the ball pit was originally for C.C.N., but they gave it to M.L.'s family when he outgrew it, so it was "not necessarily" a "princess ball pit," and C.C.N. would not have been able to fit into it.  C.C.N.'s father also said that M.L. had a reputation for dishonesty "[s]ince she was very young."  Defense

counsel also called M.L.'s cousin as a witness to testify that M.L. had a reputation for dishonesty within the family.

¶ 23    In closing, defense counsel called M.L.'s credibility into question by arguing that she said she had observed C.C.N.'s genitalia at least ten and possibly more than twenty times and had put "her mouth to the penis on several occasions," yet she could not describe it in detail.  Counsel said that M.L. "was able to easily describe . . . [C.C.N.'s] appearance . . . when she was in the [forensic interview], but when confronted with [the] appearance of the penis, . . . she could not make any concrete verbalization of that penis."  Counsel contrasted M.L.'s testimony that C.C.N.'s penis was not small and that M.L. failed to observe any difference between C.C.N.'s penis and his friends' penises with other testimony suggesting that C.C.N. had small genitalia because of his genetic condition.

¶ 24    Counsel also noted that other witnesses had testified that the basement in M.L.'s house was "off limits," that C.C.N. would not have fit in the ball pit where some of the alleged abuse occurred, and that the ball pit was not princess themed as M.L. had claimed. Counsel argued that if M.L. was mistaken about that "simple,

11

important fact," "then it is problematic to believe the rest of her testimony." Counsel also argued that M.L. could have been using C.C.N. as a "scapegoat" to "displace some responsibility" from her behavior that resulted in her admission to a mental health hospital.

¶ 25 In its judgment adjudicating C.C.N. delinquent, the juvenile court explained that the trial "boil[ed] down to the credibility of the witnesses" and even read aloud the pattern jury instruction on assessing witness credibility. The court discussed M.L.'s forensic interview in some detail, noting that M.L. was "far less nervous during the [forensic] interview, and the facts and some of the details were a lot more clear . . . than it was on the stand." The court also noted that, in the forensic interview, M.L. was "able to give much more specific details . . . about what happened in the ball pit, much more clarification about the fact that they weren't both in the ball pit, that [C.C.N.] was kind of sitting in the entrance into the ball pit, and that's when he made her touch — touch his penis." The court also said that, in the interview, M.L. gave more details about her age when the assaults occurred, the type of sexual assaults that occurred, and how many times the assaults occurred. The court noted that the interview made it clear that the victims' disclosures

12

occurred after the victims' mother said she was going to ask C.C.N. to babysit their younger sister.

¶ 26    The juvenile court ultimately found that the prosecution had met its burden to prove the elements of the charged offenses. The court focused on the victims' credibility, explaining that M.L.'s "testimony in court was clearly corroborated by the information that she gave at the [forensic] interview." The court found M.L. to be credible and noted that "so much time has passed and [M.L.] was very young when the alleged offense[s] occurred, and so the lack of detail [was] not . . . negatively affecting her . . . credibility." The court found that the victims had no motive to lie, highlighting the absence of any "ongoing family disputes" and the "alienation" both victims suffered because of the disclosure, which the court found "extraordinarily credible" and "not for their own attention or self-serving."

b.    The Court Did Not Err by Admitting the Forensic Interview

¶ 27    C.C.N. contends that the juvenile court erred by admitting M.L.'s entire forensic interview because (1) defense counsel did not broadly attack M.L.'s credibility, and (2) the court relied on the interview as substantive evidence. We perceive no error.

¶ 28     We reject C.C.N.'s attempt to characterize defense counsel's attack on M.L.'s credibility as limited to impeaching M.L. with what she said in the forensic interview about how C.C.N.'s "body was different . . . than it is now."  C.C.N.'s theory of the case was that M.L. had fabricated the sexual assault because she wanted to deflect from her own behavior when she was admitted to a mental health hospital.  Thus, defense counsel broadly attacked M.L.'s credibility throughout trial, generally challenging her veracity as manifested in her inability to recall specific details of the assaults.  For example, counsel sought to undermine M.L.'s testimony about where the abuse occurred — including the details of the ball pit size and theme — as well as the physical attributes of C.C.N.'s body.  Counsel also questioned M.L.'s "reputation for being honest" and presented multiple character witnesses to testify that M.L. had a reputation for dishonesty within her family.

¶ 29     Defense counsel put M.L.'s credibility at the heart of the case.  That counsel played only a segment of the forensic interview at trial does not alter our view that counsel's attack was broad and generalized; it was not limited to impeaching M.L. regarding specific facts but was instead intended to undermine her testimony that any

14

of the assaults occurred. Because counsel engaged in an unlimited and robust attack on M.L.'s credibility generally, and her testimony concerning the details of the alleged assaults specifically, the juvenile court did not abuse its discretion by admitting the entire forensic interview for rehabilitative purposes. *See Clark*, ¶ 126; *see also Pernell v. People*, 2014 COA 157, ¶ 39 (defense counsel's thorough cross-examination of the witness about her version of events and her prior statements was "precisely the kind of attack on a witness's credibility that allows for the introduction of prior consistent statements to rehabilitate that witness"), *aff'd on other grounds*, 2018 CO 13.

¶ 30    Nor are we persuaded that the juvenile court relied on the forensic interview as substantive evidence to determine C.C.N.'s guilt. C.C.N. argues that M.L.'s testimony "consisted largely of vague, non-specific one-word answers" and that the prosecution needed the interview to "fill in the details." But M.L. testified about five distinct incidents that involved different places, circumstances, and types of sexual assaults.

¶ 31    We acknowledge that, in its oral ruling, the court spent more time detailing what M.L. said in the interview than what she

15

testified to at trial. But the full interview was not played at trial, so it is understandable that the court would summarize the parts of the video it viewed as rehabilitating M.L., given the broad attack on her credibility and the circumstances surrounding her disclosure. The court noted that this case centered on the credibility of the victims' disclosures, and the forensic interview made clear that the timing of M.L.'s initial disclosure was not because of her mental health crisis. For example, defense counsel argued that M.L.'s inability to recall simple details about the ball pit made it "problematic" to believe the rest of her story, but the court noted the additional details M.L. provided in the forensic interview clarified M.L.'s recollection of the ball pit incident.

¶ 32 Ultimately, the court concluded that the forensic interview *corroborated* M.L.'s trial testimony and placed M.L.'s disclosure in context. In particular, the forensic interview corroborated M.L.'s trial testimony that she had disclosed the abuse to her mother when she was five or six, *before* she was admitted to the mental health hospital. Thus, we conclude that the court did not rely on the forensic interview to fill in substantive evidentiary gaps or to find an instance of abuse that M.L. did not testify about at trial;

instead, it relied on the interview to support its finding that M.L.'s trial testimony was credible notwithstanding such gaps. *See Eppens*, 979 P.2d at 20-21.[3]

¶ 33　　To the extent that C.C.N. contends that the evidence should have been excluded because it was unfairly prejudicial under CRE 403, we disagree. In deference to the juvenile court's admissibility ruling, we assume the maximum probative value and the minimum unfair prejudice attributable to the disputed evidence. *Yusem v. People*, 210 P.3d 458, 467 (Colo. 2009). Because defense counsel so broadly attacked M.L.'s credibility, we conclude that the probative value of the evidence for rehabilitative purposes was not substantially outweighed by the danger of unfair prejudice.[4] *See* CRE 403; *Eppens*, 979 P.2d at 22; *Yusem*, 210 P.3d at 467.

---

[3] C.C.N. argues that the *prosecutor* relied substantively upon the interview when arguing C.C.N.'s guilt, but he does not point to any specific instances in the record to support his argument, and we note that the prosecutor did not mention the interview during closing argument. *See People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 49 (declining to address a defendant's conclusory and underdeveloped argument), *aff'd*, 2025 CO 2.

[4] To the extent C.C.N. argues that the forensic interview was prejudicial because it contained a "new allegation," he does not develop that argument on appeal, so we decline to address it further. *See Rodriguez-Morelos*, ¶ 49.

¶ 34    In the end, we conclude that the juvenile court did not abuse its discretion by admitting M.L.'s complete forensic interview for rehabilitative purposes. *See Eppens*, 979 P.2d at 20-21; *Miranda,* ¶ 15; *Clark,* ¶ 126.

### 3.    Sergeant Fowler's Testimony

¶ 35    C.C.N. contends that the juvenile court erred by admitting Sergeant Fowler's testimony regarding hearsay statements made by M.L.  We perceive no reversible error.

### a.    Additional Background

¶ 36    During Sergeant Fowler's testimony, the prosecutor asked, "What [did M.L.] describe to you happening by [C.C.N.]?"  Sergeant Fowler started to respond, "[M.L.] describe[d] multiple times between the age — or between kindergarten and third grade," but defense counsel objected to hearsay.  The prosecutor cited CRE 801(d)(1)(B)[5] and *Eppens*.  Defense counsel had "[n]o response," and the court overruled the objection.  The prosecutor repeated his question, and Sergeant Fowler responded, "[B]etween kindergarten

---

[5] The prosecutor cited to CRE 801(b)(1), but the parties do not dispute that he meant CRE 801(d)(1)(B).

and third grade, [M.L.] described [C.C.N.] forcing her to touch his penis and him touching her vagina."

b.     Any Error in Admitting the Statements Was Harmless

¶ 37     Even assuming, without deciding, that the court erroneously admitted M.L.'s statement to Sergeant Fowler, we conclude that any error was harmless. Sergeant Fowler's testimony was brief and lacked detail about any particular instance of sexual assault. *See People v. Cardenas*, 25 P.3d 1258, 1263 (Colo. App. 2000) (any error in admitting hearsay testimony was harmless because the statement was brief and general in nature). It was also cumulative of M.L.'s testimony and the properly admitted rehabilitative forensic interview. *See People v. Caldwell*, 43 P.3d 663, 669 (Colo. App. 2001) (the improper admission of a hearsay statement was harmless because it was "cumulative of other properly admitted evidence"). And when viewed in the context of Sergeant Fowler's complete direct examination, the question and answer appear designed to explain how the investigation began. *See People v. Bowman*, 812 P.2d 725, 727-29 (Colo. App. 1991) (any error in admitting an investigating officer's testimony about the defendant's statements to a social worker was harmless when the testimony

19

was admitted in part as background information to explain the investigation). Accordingly, we conclude that any error by the juvenile court in admitting the statement did not substantially influence the verdict or affect the fairness of the trial proceedings. *See Hagos*, ¶ 12.

## C. Rape Shield Evidence

¶ 38 C.C.N. contends that the juvenile court erred by relying on the rape shield statute, § 18-3-407(2) C.R.S. 2023,[6] to exclude evidence that M.L. had falsely accused her father of sexually assaulting her. We perceive no error.

## 1. Applicable Law

¶ 39 The purpose of Colorado's rape shield statute is "to protect sexual assault victims from humiliating public fishing expeditions into their past sexual conduct." *People v. Cook*, 2014 COA 33, ¶ 36. To that end, the statute creates a presumption that evidence of "specific instances of the victim's . . . prior or subsequent sexual conduct" is irrelevant except in certain instances. § 18-3-407(2);

---

[6] Section 18-3-407, C.R.S. 2023, was in effect at the time of the events at issue, and we refer to that version throughout this opinion. The statute has since been amended.

*People v. Williamson*, 249 P.3d 801, 802 (Colo. 2011). The term "sexual conduct" encompasses "a broad range of behaviors related, but not limited, to sexual contact and intercourse." *Williamson*, 249 P.3d at 803.

¶ 40 There are several exceptions to the general prohibition against admitting such evidence. As relevant here, a defendant may offer "evidence that the victim . . . has a history of false reporting of sexual assaults." § 18-3-407(2); *see People v. Lancaster*, 2015 COA 93, ¶ 36. To introduce such evidence, the proponent must file a written motion at least thirty-five days before trial, accompanied by an affidavit containing an offer of proof regarding the relevancy and materiality of the proposed evidence. § 18-3-407(2)(a). Typically, the court holds a pretrial hearing to determine the admissibility of the prior false accusations. § 18-3-407(2)(c). But "[a]n in camera hearing may be held during trial if evidence first becomes available at the time of the trial or for good cause shown." § 18-3-407(2)(d).

### 2. Additional Background

¶ 41 During cross-examination, defense counsel asked M.L., "Did you claim that your father had sexually assaulted you?" The prosecutor objected, citing the rape shield statute. Defense counsel

argued that he was not asking about M.L.'s prior sexual conduct but wanted to impeach M.L. with a prior false accusation. The juvenile court sustained the prosecutor's objection, concluding that the evidence was covered by the rape shield statute, counsel had not filed a written motion at least thirty-five days before trial, and counsel could not "get around" the procedural requirement by arguing that the evidence was for impeachment.

### 3. The Juvenile Court Did Not Err by Excluding Evidence of M.L.'s Allegedly False Accusation

¶ 42    C.C.N. contends that the juvenile court erred by concluding that M.L.'s allegedly false accusation that her father sexually assaulted her fell within the scope of the rape shield statute. He argues that the purpose of the evidence was to impeach M.L. by showing that she had a reputation for dishonesty, not to prove that M.L. had engaged in any sexual conduct.

¶ 43    But the rape shield statute specifically covers the type of evidence defense counsel sought to introduce at trial — a victim's "history of false reporting of sexual assaults." § 18-3-407(2)(a); *see People v. MacLeod*, 176 P.3d 75, 81 (Colo. 2008) ("In section 18-3-407(2)(a), the statute lists every type of evidence that is

presumptively irrelevant unless a proponent makes a successful offer of proof."); *People v. Ramcharan*, 2024 COA 110, ¶ 30 (a party can introduce evidence of a victim's history of false reporting of sexual assaults only by adhering to the procedure in section 18-3-407(2)). And the statute has no "purpose" exception. *MacLeod*, 176 P.3d at 80. Its "broad, all-inclusive language" deems such evidence presumptively irrelevant in any criminal prosecution, subject to certain exceptions, regardless of whether the evidence is offered for the truth of the matter asserted or for some other purpose, such as impeachment. *See id.* at 80-81.

¶ 44 Thus, to introduce evidence that M.L. had previously made a false accusation of sexual assault, C.C.N. was required to follow the procedures outlined in the statute. *See* § 18-3-407(2)(a)-(c); *MacLeod*, 176 P.3d at 82 (Generally, "[t]he procedural requirements of a pretrial motion and an in camera hearing must be satisfied before a [victim] can be compelled to answer questions in public about the [victim's] sexual history."). It is undisputed that C.C.N. made no attempt to follow the statutorily required pretrial procedure.

¶ 45   Yet C.C.N. argues that the court should have admitted the evidence of M.L.'s prior false allegation because the court is allowed to hold an in camera hearing *during* trial "if evidence first becomes available at the time of the trial or for good cause shown." § 18-3-407(2)(d).  C.C.N. does not argue that the evidence first became available at the time of trial, but he does argue that he has shown "good cause" because, without the offered evidence, he was not able to meaningfully cross-examine M.L. on her motive to lie.

¶ 46   Notably, defense counsel did not raise this argument before the juvenile court.  Because the argument is unpreserved, we review for plain error.  *Hagos*, ¶ 14.  Plain error is error that is obvious and substantial, such that it "undermine[s] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (citation omitted).  For an error to be obvious, it must contravene a statute or rule, a well-settled legal principle, or established Colorado case law.  *Campbell v. People*, 2020 CO 49, ¶ 25.  The error must be "'so clear-cut, so obvious,' a trial judge should be able to avoid it without benefit of objection." *Romero v. People*, 2017 CO 37, ¶ 6 (citation omitted).

¶ 47　C.C.N. cites no authority supporting his claim that simply wanting to attack the credibility of a victim constitutes good cause to offer rape shield evidence without following the necessary procedural requirements.  And we conclude that the recognition of such an exception would effectively eviscerate the procedural requirements and substantive purpose of the statute.  Accordingly, we perceive no error, plain or otherwise.  *See Hagos*, ¶ 14.

### III.　Disposition

¶ 48　We affirm the judgment.

JUDGE FREYRE and JUDGE SCHUTZ concur.